Carl COLEMAN, Appellee,

v.

HERTZ CORPORATION, a corporation
d/b/a Hertz Truck Rental Serv-
ice, Appellant,

v.

FIRESTONE TIRE AND RUBBER COM-
PANY, a corporation, Appellee.

No. 46155.

Court of Appeals of Oklahoma,
Division No. 2.

Feb. 4, 1975.

Released for Publication by Order of the
Court of Appeals May 1, 1975.

George Sam Caporal, Oklahoma City, and
Keith R. Treadway, Oklahoma City, for ap-
pellee Carl Coleman.

J. A. O'Toole, Oklahoma City, for ap-
pellant.

BRIGHTMIRE, Judge.

On a chilly day in April 1967, a milk-
man, Carl Coleman, was driving his Gilt
Edge milk truck along the highway at
about 50 m.p.h. when all of a sudden its

left rear dual wheels fell off causing the truck to lurch sideways, plaintiff's head to be slammed into the steering wheel, and then his hapless body thrown down on the steel floorboard of the cab as the faltering vehicle careened out of control into a bar ditch.

For his injuries the jury awarded plaintiff a verdict for $17,010.75 against Hertz Corporation d/b/a Hertz Truck Rental Service—the entity which leased the faulty truck to plaintiff's employer. Hertz appeals claiming the judgment entered on the verdict should be vacated and one entered for it instead or else grant it a new trial against both plaintiff and a third party defendant it impleaded—Firestone Tire and Rubber Company, a corporation, because: (1) the evidence does not support an actionable cause against it; (2) an answer to a special interrogatory is irreconcilable with the general verdict.

On the afternoon of April 17, 1967, plaintiff finished delivering milk to customers on a retail route he had serviced almost every day for two years and was returning to the plant. As he drew near his destination he became aware that a tire on the left dual of his one-ton GMC was deflated.

At the plant, after telling a Hertz mechanic about the flat tire, plaintiff removed empty containers from his truck, loaded it for the next day's run, then drove the truck down to a garage Hertz maintained on the dairy's premises. There the Hertz employee informed him he had called Firestone to have the tire fixed. Plaintiff says he checked in at the office "messed around a little bit . . . had a cup of coffee" and as he was leaving the dairy he saw a man in a Firestone uniform there fixing the flat.

At this point we should explain that on August 13, 1949, plaintiff's employer, Gilt Edge Dairy, Inc., entered into a truck leasing contract with Hertz in which the latter agreed to furnish the former more than 50 trucks in consideration of stipulated rental. Hertz further agreed to provide, at its own expense, "complete, suitable and adequate garage service, including . . . inspection and storage space for said vehicles" and "to maintain" them "in good repair, mechanical condition and running order." This included supplying "all necessary tires and tubes." In order for Hertz to fulfill its obligation the contract specified that Gilt Edge drivers would deliver the leased trucks to Hertz' garage where they would receive needed repairs and a "complete inspection." And in addition Hertz bound itself "to make regular inspection of each such vehicle to eliminate, in so far [sic] as possible, interruptions to" Gilt Edge's service.

To carry out its tire maintenance agreement Hertz most of the time employed Firestone Tire and Rubber Company. As will appear shortly there is some question about whether Firestone actually fixed the flat in question.

It was under these circumstances that plaintiff drove his truck in for the tire repair. Then early the next morning, April 18, 1967, plaintiff found his truck "back on the line with the rest of the trucks" with the refrigeration plugged in like they do when a truck has been repaired, serviced and is ready to go. From his visual inspection the faulty left rear tire appeared to have been fixed. So he started the van up and drove away.

By the time plaintiff completed his deliveries that day he had driven about 40 or 50 miles and made close to 50 stops. It was while he was returning to Oklahoma City, Oklahoma, traveling along the highway at about 50 m.p.h. that the left rear wheels dropped off the truck as we mentioned earlier. There was no forewarning signs —no vibration, no jerking, no sounds, no wobbling . . . nothing. Once the disabled truck came to a stop in the ditch, plaintiff picked himself up. His mouth and shoulder were hurting. He managed to get out of the truck, look around, and

try to see what had happened. First thing he noticed was that both left tires were missing, one of which he saw "hanging in a fence on the left-hand side of the road and another one had cleared the fence on the right-hand side of the road," and was "50 to 75 yards off in a field." Plaintiff also noticed the nuts were gone from the lug bolts on subject wheel and that "the lug bolts were not stripped out or anything . . . [but] were just in perfect shape like they had been left loose . . .."

Plaintiff filed this action only against Hertz. He sought recovery for his injuries on two theories: (1) breach of an implied warranty running from Hertz to plaintiff that the truck it furnished and maintained for plaintiff's use as a retail milk delivery truck was fit for such purpose for which breach Hertz was "strictly liable"; (2) negligence under the doctrine of res ipsa loquitur of a conditional nature in that the repair and inspection of the lost wheel was under the exclusive control of Hertz and under the circumstances involved the wreck would not have occurred had Hertz not been negligent and in any event Hertz neglected to properly secure the left rear wheel on plaintiff's truck or to inspect and make sure others had done so.

Hertz' answer denied all this, charged plaintiff with some unspecified contributory negligence, then turned around and alleged the mishap was "an unavoidable, inevitable misfortune and casualty which occurred without any negligence . . .." Next it denied warranting "in any manner that the left rear dual wheels and tires had been inspected, repaired, and were fit and proper for their customary use." Finally Hertz blamed any tire repair negligence on Firestone and that it was an independent contractor for whose negligence Hertz was not liable.

Hertz then obtained leave of court (over objection of plaintiff) to bring in Firestone as an additional party defendant against whom it filed what it called a "cross claim" setting up its independent

contractor theory and in its prayer for relief saying: ". . . defendant cross claimer prays that in the event that the plaintiff effects a recovery herein against this defendant, that this defendant have judgment over and indemnification against Firestone . . . for the amount of the verdict . . .."

Firestone's motion for a separate trial was denied and after it denied causing the damage the case went to trial.

Plaintiff put on evidence that in general supported both of its theories. At the close of plaintiff's case in chief defendants moved "the Court to require the plaintiff to elect upon which theory he is proceeding." The record is silent as to the court's ruling but it does appear the court had earlier indicated he would require such an election because he asked: "What are you going to do on that, Keith [plaintiff's attorney]?" Before counsel could answer the court went on to another issue. At the close of the case the court revived the matter and plaintiff elected to proceed on the theory of implied warranty and drop negligence. Directed verdict motions of defendants were overruled and the case was submitted to the jury on the theory of implied warranty which the court—after specifying the facts plaintiff had to prove one of which included a defective truck—said meant with "reference to this case":

"The lessor of a truck who contracts to service, repair and maintain said vehicle for its customers impliedly warrants and represents that the truck will safely perform the function for which it was leased and intended to be used; and when such truck is being reasonably used for the purpose and in the manner intended the lessor will be liable for injuries or damages proximately caused by the failure of the truck to perform as warranted."

With regard to Firestone the court instructed: "Your verdict concerning the defendant, Firestone Tire & Rubber Company, will be by your answer to the Interrogatory and their [sic] rights or liabilities

will be determined as a matter of law upon that answer."[1]

Hertz' first proposition—that the evidence is insufficient to establish liability against it—Centers around the absence of what it considers two "necessary elements" of proof from both the evidence and the instructions, namely, (1) that the wheel assembly was defective; and (2) that Hertz knew or by the use of reasonable care should have known about any such defect at the time the truck was delivered to plaintiff.

■ We agree that it was necessary for plaintiff to prove the first mentioned element. The rationale of Hertz' argument that he did not do so is that first of all the lease agreement did not obligate it "to insure the vehicles" but only " 'to maintain [them] . . . in good repair, mechanical condition and running order.' " Secondly, continues Hertz, "[t]he uncontradicted evidence at trial was that the left rear dual tires fell off the truck driven by the plaintiff. The only explanation for this occurrence offered by the plaintiff was that defendants Hertz and/or Firestone ' . . . failed and neglected or ommitted [sic] to properly repair said wheels . . . .' This explanation was also advanced by Walter Jones, plaintiff's expert witness. The jury explicitly rejected this explanation by answering the following Interrogatory in the negative."

So the first question to resolve is whether the jury's negative answer to the interrogatory (see footnote 1) did indeed have the effect of (1) finding the truck was without a defect, or (2) "explicitly" rejecting plaintiff's explanation of what the defect was. In our opinion the interrogatory answer cannot be said to have resulted from either finding.

Why? Because all the jury was asked about was whether *Firestone* (a) worked on the truck April 17, 1967, and, (b) if it did, did the left rear dual wheels come off because it failed to properly secure them onto the truck. Obviously, since—as will be explained later—the record in this case leaves no room for any finding other than that the wheels came off because their lug nuts were not properly tightened the evening before, the negative interrogatory an-

1. The interrogatory was submitted on a general verdict form and reads as follows:

"CARL COLEMAN

Plaintiff.

vs.

The Hertz Corporation, a corporation, d/b/a Hertz Truck Rental Service,

Defendant,

vs.

Firestone Tire & Rubber Co., a corporation,

Defendant.

INTERROGATORY VERDICT     CJ–71–3772

"The contested issue in this lawsuit between the defendant Hertz Corporation and the defendant Firestone Tire & Rubber Company is being submitted to you by the following question: Please read this question carefully and be sure that you understand the question; then deliberate on the matter; and then determine your answer. Mark your answer where indicated and if all of you agree on the answer, your foreman alone will sign it; but if you do not all agree but as many as nine of you do, those agreeing will each sign below the answer.

"The question is: Do you find from your consideration of all of the evidence that the defendant Firestone Tire & Rubber Company worked on the truck in question on April 17, 1967, and as a result thereof failed to properly secure or tighten the nuts which caused the left rear dual wheels to come off the axle. Please give a yes or no answer to this question. Yes ____ No X

s/Everett Freeman

Foreman"

swer had to result from a finding that Firestone did not perform the April 17 tire repair—a finding completely justified under the evidence in view of the rather convincing—and undisputed by Hertz—evidence of Firestone that it did not.[2] This conclusion—that the jury merely found Firestone did not repair the flat in question—is reinforced by the fact that the jury turned right around and found that "the truck was in fact defective" by returning a verdict against Hertz.

As we said earlier the evidence rather compelled finding the truck was defective. Not only did plaintiff's expert opine that the wheels came off because the lug nuts rotated loose by reason of not having been put on sufficiently tight in the first place, but the circumstances surrounding the incident admit of no other reasonable explanation. Indeed the various Hertz and Firestone "experts" testified they could think of only two reasons why a wheel would come off the stud backup plate, namely, (1) crystallization and breaking off of the studs; (2) loose nuts coming off the studs or bolts. Notwithstanding the undisputed facts that (a) the studs did not break off, and (b) the wheels did come off without stripping the treads on the bolts, the defense experts manifested not the slightest bit of inhibition in swearing that what actually did happen was "impossible"![3]

We turn now to the other element Hertz claims to be essential—that is even if a defect there was, plaintiff still had to prove that Hertz knew of it or else it did not exercise reasonable care to discover it. This element, says Hertz, was left unproved by plaintiff and ignored by the trial court in its instructions. Support for this argument

is sought by Hertz from two sources: (1) defect cases brought on the theory of negligence, i. e., Casey v. Beaudry Motor Co., 83 Ariz. 6, 315 P.2d 662 (1957); (2) early bailment cases which tended to restrict a bailor's liability for furnishing a defective chattel by watering down an implied warranty of fitness with a page from the book of negligence requiring only that the bailor exercise reasonable care in seeing to it that the bailed thing is safe for the intended use, i. e., McNeal v. Greenberg, 40 Cal.2d 740, 255 P.2d 810 (1953).

The first source is, of course, no help at all on the warranty question. The second source speaks to the right issue but in tapping it Hertz stops short of following through with an analysis of product liability law's developmental "revolution" wrought by an avalanche of decisions in recent years which has seen non-negligence tort theory of implied warranty by makers and sellers of products gradually lose its excess sales law baggage—such as privity and notice (though courts still refer to "a sale" itself)—and transcend into a simpler theory generally referred to throughout the country as "strict liability in tort." This transformation was recently recognized and summarized by our state supreme court in Kirkland v. General Motors Corp., Okl., 521 P.2d 1353 (1974)—a case which incorporates into the law of this state the no-fault tort concept under the name of "manufacturers' product liability." Notwithstanding the restrictive nomenclature adopted, *Kirkland* projects a philosophy and spirit broad enough to be consistent with the extension of the strict liability doctrine to all commercial suppliers—such as the truck leasing company here—where

2. Firestone placed in evidence a series of records consisting of Hertz purchase orders and Firestone invoices which described in detail each tire job for Hertz including what was done, when it was done, and the number of the truck it was done on. These daily records (copies of which Hertz did not deny having among its records) contained neither a Hertz purchase order nor a Firestone charge for any tire work on plaintiff's truck, No. 49873, on April 17, 1967. Such

documents however, did show Firestone mounted two tires on No. 49873 on April 18, 1967—the day of the wreck—after they had fallen off.

3. For example, one 27-year tire service veteran employed by Firestone apparently saw nothing irrational in testifying: "I mean it would be impossible . . . . [f]or a wheel to come off without stripping the [stud] threads."

no sale is involved. We hold that it does and here is why.

Throughout *Kirkland* are various references to the public policy underlying it—a policy which applies with equal reason to the truck leasing operation of Hertz here. For instance, this language is quoted: "[U]pon whatever ground the liability of such a manufacturer to the ultimate consumer is placed, the result is eminently satisfactory, conducive to the public welfare and one which we approve." Later the opinion says, "The clear logic of Henningsen v. Bloomfield Motors, 32 N.J. 358, 161 A.2d 69, 75 A.L.R.2d 1 (1960) should prevail in Oklahoma: 'The burden of losses consequent upon use of defective articles is borne by those who are in a position to *either control the danger or make an equitable distribution of the losses* when they do occur . . . .'" (emphasis ours). And, "The rationale for such a rule [manufacturers' products liability] is founded upon public interest in human safety . . . . 'It is to the public interest to discourage the marketing of products having defects that are a menace to the public. . . .'"

■ While *Kirkland* delivered the newborn strict liability principle from its common law womb in this state it did not sever the offspring's umbilical cord from its maternal attachment—the law of sales.[4] This bit of legal surgery we perform in this case consonant with the humane aspects of *Kirkland*.[5]

■ In order to shorten our guest for an answer—as well as this opinion—we turn for authoritative guidance to a decision handed down in 1965 by the same court *Kirkland* lauded for its "clear logic" in Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69, 75 A.L.R.2d 1 (1960). The case we refer to is Cintrone v. Hertz Truck Leasing & Rental Serv., 45 N.J. 434, 212 A.2d 769 (1965). There the court considered the question of whether the doctrine of strict liability in tort should be applied to a truck leasing company who supplied for hire all of the trucks used by a Jersey City, New Jersey, company called Contract Packers, Inc.; in a suit brought by an employee to recover for injuries he alleged he sustained while riding in a Hertz truck which crashed after the brakes failed. In concluding there was "no good reason" why it should not the court explored at length various facets of the problem along with the views of eminent scholars.[6] We are impressed with the in-

4. Throughout the *Kirkland* opinion reference is made to "the sale of any defective product"; it seems to adopt The American Law Institute's Restatement (Second) of Torts § 402A (1965) which starts out talking about "One who sells any product in a defective condition . . . ."; and in detailing the essential elements of plaintiff's proof the court requires "*Secondly*" that the defect existed when the article left possession of the manufacturer or "If the action is against the retailer or supplier of the article, then the Plaintiff must prove that the article was defective *at the time of sale* for public use or consumption or at the time it left the retailer's possession and control." (latter emphasis ours)

5. We believe the *Kirkland* law is available for our use here even though the case was tried before the *Kirkland* mandate issued for two reasons: (1) the theory of implied warranty was correctly applied, and (2) *Kirkland* specified that the law it establishes is applicable "prospectively to all cases for trial from and after the date the mandate issues herein; and may likewise be applied by the appellate courts in cases which have been tried and are for decision on appeal where it would not prejudice the rights of the litigants," and we think its application in the case at bar will not prejudice the rights of any of these parties.

6. All writers considering the issue argued persuasively that strict product liability should not be tied to sales, but should extend to non-sale suppliers such as lessors. 2 Harper & James, Torts § 28.19 (1956); Uniform Commercial Code § 2–313 Comment 2; W. Prosser, The Law of Torts § 95 (4th ed. 1971); 1 Frumer & Friedman, Products Liability § 19.02 (1964); Vold, Sales 454 n. 42a (2d ed. 1959); Annot., 68 A.L.R.2d 850 (1959); Farnsworth, "Implied Warranties of Quality in Non-Sales Cases," 57 Colum.L. Rev. 653, 673–674 (1957).

Though not in existence for the use of the New Jersey court, an article discussing the problem which the reader might find of in-

tellectual honesty disclosed by *Cintrone* as well as its unassailable logic which is perhaps best summarized by this language: "A bailor for hire, such as a person in the U-drive-it business, puts motor vehicles in the stream of commerce in a fashion not unlike a manufacturer or retailer. In fact such a bailor puts the vehicle he buys and then rents to the public to more sustained use on the highways than most ordinary car purchasers. The very nature of the business is such that the bailee, his employees, passengers and the traveling public are exposed to a greater *quantum* of potential danger of harm from defective vehicles than usually arises out of sales by the manufacturer. We held in *Santor* the liability of the manufacturer might be expressed in terms of strict liability in tort. Santor v. A & M Karagheusian, Inc., supra (44 N.J. [52] at 66–67, 207 A.2d 305); see also, Restatement (Second), Torts, § 402A, comment m, pp. 9–10 (Tent.Draft No. 10, 1964). By analogy the same rule should be made applicable to the U-drive-it bailor-bailee relationship. Such a rental must be regarded as accompanied by a representation that the vehicle is fit for operation on the public highways. . . . Accordingly, we are of the opinion . . . that the responsibility of Hertz may properly be stated in terms of strict liability in tort . . . ." We adopt, as several other courts have,[7] the reasoning of *Cintrone*

(except where the author employs the term "implied warranty" as a basis for strict liability because this is at war with a *Kirkland* sanction). Applying it to the facts of this case we hold the trial court properly refused to instruct the jury that they "must also find that the defect must be one capable of detection by the defendant by the use of reasonable care and if it did not so find, it must return a verdict for the defendant."

Hertz' other contention is that its motion for judgment notwithstanding the verdict should have been granted because the jury's negative answer to the special interrogatory was inconsistent with the general verdict and in such a situation statutory law specifies that "the former controls the latter and the court may give judgment accordingly." 12 O.S.1971 § 589.

Hertz is correct about the law it recites, but as we have already seen, it is inapplicable here because there was no inconsistency between the special interrogatory answer and the general verdict.

We find no error in the record justifying us in concluding either that justice miscarried or that any substantial right of Hertz was adversely affected.

Affirmed.

NEPTUNE, P. J., and BACON, J., concur.

terest is one written by Professor William J. McNichols entitled "The Kirkland v. General Motors Manufacturers' Products Liability Doctrine—What's In a Name?" 27 Okl.L. Rev. 347 (1974).

7. Bachner v. Pearson, Alaska, 479 P.2d 319 (1970); Price v. Shell Oil Co., 2 Cal.3d 245, 85 Cal.Rptr. 178, 466 P.2d 722 (1970); Stewart v. Budget Rent-A-Car Corp., 52 Hawaii 71, 470 P.2d 240 (1970); Stang v. Hertz Corp., 83 N.M. 730, 497 P.2d 732 (1972).