HOLLOWAY, Chief Judge.
 

 The plaintiff-appellee Jones filed this action as an adversary proceeding arising out of a Chapter 11 bankruptcy. The plaintiff initially sued three entities: (1) Production Services, Inc. (PSI); (2) Otis Engineering, Inc. (Otis); and (3) Wilson Industries, Inc. (Wilson or defendant). The dispute between the plaintiff and Wilson arose out of drilling operations at the plaintiff’s oil well. Initially, the plaintiff retained PSI as a consultant and supervisor to recomplete the well. PSI began work on the well in March of 1979. PSI cleared the well of shale bridges; however, the well continued to bridge over. PSI then ordered Otis to the well site to dislodge the shale bridges.
 

 Otis first attempted to clear the well with the use of a coil tubing unit. This effort proved to be unsuccessful. Otis then employed a milling device known as a dyna-drill
 
 [1]
 
 to attempt to clear the well. After a short period of drilling, the dyna-drill became stuck in the well. (Tr. XXXI, 101). A “fishing” job was required to remove about 11,700 feet of coil tubing and the dyna-drill from the well.
 

 Wilson was employed to fish the coil tubing and the dyna-drill from the well.
 
 (Id.
 
 at 114). Wilson was successful in retrieving a large portion of the tubing. It then advised PSI and the plaintiff that it would be difficult to fish out the remaining tubing due to the conditions of the well. The plaintiff, however, with the advice of PSI, decided to attempt to mill up the remaining tubing in the well with the use of a flat-bottom mill.
 
 (Id.
 
 at 106-07, 247). This was unsuccessful, and the mill was removed from the well. Shortly after removal, it was discovered that the mill had separated from the shaft body and had remained in the well at about 11,000 feet.
 
 (Id.
 
 at 110).
 

 Wilson spent the next twenty-one days attempting to fish the severed mill from the well. The task was eventually successful. However, the operation at the well was subsequently shut down due to the loss of circulation.
 
 (Id.
 
 at 115-17). The plaintiff then filed a Chapter 11 petition in bankruptcy.
 

 Pursuant to the then Interim Rules implementing 28 U.S.C. § 1471(c), the plaintiff sued PSI, Otis, and Wilson in an adversary proceeding. The plaintiff sought recovery for the cost of the fishing jobs and damage to the well.
 
 [2]
 
 The initial complaint alleged counts of negligence and breach of contract as to PSI, and negligence and manufacturer’s products liability as to Otis and Wilson. The plaintiff, however, dismissed the negligence count against PSI in
 
 *1135
 
 his Amended Pretrial Order for the first trial.
 
 [3]
 
 (Tr. II, 382).
 

 On the day of the first trial, PSI settled with the plaintiff for $100,000 and a release of its claim filed in the bankruptcy proceeding for services performed at the well site. (Tr. XXIV, 3-4). The trial proceeded against Otis and Wilson. The jury was unable to agree upon a verdict and a mistrial was declared. Before the second trial, Otis settled with the plaintiff for $125,000 and a release of its claim in bankruptcy. (Tr. XXXI, 5). The trial then proceeded against Wilson as the sole defendant.
 

 The jury returned a verdict in the plaintiffs favor for $265,000. Wilson’s counsel then moved the bankruptcy court to reduce the verdict by the amounts paid in settlement by PSI and Otis pursuant to Okla.Stat. tit. 12, § 832(H) (1981) (Okla. Contribution Statute). (Tr. XXXI, 670). The court denied Wilson’s motion but did offset the amount of Wilson’s claim for services against the verdict.
 
 [4]
 
 The parties then agreed to a direct appeal to this court from the final judgment of the bankruptcy court pursuant to 28 U.S.C. § 1293(b) of the 1978 Bankruptcy Code.
 
 See Berg v. Shannon (In re Shannon), -
 
 670 F.2d 904, 905-06 (10th Cir.1982) (per curiam). The notice of appeal was filed on October 15, 1982. We, therefore, have appellate jurisdiction of this case.
 
 Accord In re Quanta Resources Corp.,
 
 739 F.2d 927 (3d Cir. 1984),
 
 aff'd sub nom., Midlantic Nat’l Bank v. New Jersey Dept. of Environmental Protection,
 
 — U.S. -, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986).
 
 [5]
 

 Wilson contends on appeal that the bankruptcy court lacked subject matter jurisdiction to hear the state negligence and products liability claims against it. Wilson further says that the court erred in failing to enforce an exculpatory clause in the contract between it and the plaintiff. Wilson finally argues that the court erred in failing to reduce the judgment against it by the amounts paid in settlement by PSI and Otis.
 

 I
 

 Wilson contends that the bankruptcy court could not constitutionally exercise jurisdiction over the state negligence and products liability claims. It bases its argument on
 
 Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,
 
 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). In
 
 Northern Pipeline,
 
 the Court held that § 1471(c) constituted an unconstitutional delegation of judicial power to a non-Article III court,
 
 i.e.,
 
 the bankruptcy courts. The Court stayed entry of its judgment, however, until December 24, 1982,
 
 [6]
 
 stating:
 

 In the present case, all of these considerations militate against the retroactive application of our holding today. It is plain that Congress’ broad grant of judicial power to non-Article III bankruptcy judges presents an unprecedented interpretation of Article III. It is equally clear that retroactive application would
 
 *1136
 
 not further the operation of our holding, and would surely visit substantial injustice and hardship upon those litigants who relied upon the Act’s vesting of jurisdiction in the bankruptcy courts.... We hold, therefore, that our decision shall apply
 
 only prospectively.
 

 Id.
 
 at 88, 102 S.Ct. at 2880. (emphasis added).
 

 Wilson argues that we should apply the
 
 Northern Pipeline
 
 decision to- all cases pending at trial level, on appeal, or in which no final order had been entered as of June 28, 1982, the day of the Supreme Court’s decision. (Appellant Reply Brief 9). The effect of this contention here would be to nullify the proceedings to date, necessitating the retrial of the case.
 

 In deciding what the Supreme Court intended when it stated that the
 
 Northern Pipeline
 
 decision was to be applied prospectively, we begin with the decision itself. The prospective or retroactive effect of a new rule depends upon the enunciating court’s intention.
 
 N.S.C. Contractors, Inc. v. Twin Parks Limited Partnership (In re Twin Parks Limited Partnership),
 
 720 F.2d 1374, 1376 (4th Cir.1983),
 
 cert. denied,
 
 465 U.S. 1103, 104 S.Ct. 1602, 80 L.Ed.2d 132 (1984). It must further be noted that
 
 Northern Pipeline
 
 has not only a component as to prospective application, but also a component staying the application of the entire judgment to December 24, 1982.
 
 See
 
 459 U.S. at 813, 103 S.Ct. at 199.
 

 The language employed by the Court is not dispositive itself. The opinion states “that our decision shall apply only prospectively.” 458 U.S. at 88, 102 S.Ct. at 2880. However, the Court did cite three cases in a footnote to explain the nature of the prospective-only provision.
 
 [7]
 

 Id.
 
 at 88 n. 41, 102 S.Ct. at 2880 n. 41. These cases deal with the effect of a decision like
 
 Northern Pipeline
 
 on final orders or actions taken before the decision.
 
 See White Motor Corp. v. Citibank, N.A.,
 
 704 F.2d 254, 257-59 (6th Cir.1983). Prospective application thus appears to have been intended to protect final judgments entered by the bankruptcy courts prior to the date
 
 Northern Pipeline
 
 became effective — December 24, 1982.
 

 In
 
 Boise City Farmers Cooperative v. Palmer,
 
 780 F.2d 860 (10th Cir.1985), we adopted the analysis of the Sixth Circuit in
 
 White Motor Corp. v. Citibank, N.A.,
 
 704 F.2d 254 (6th Cir.1983), quoting approvingly the conclusion “that the prospective-only provision in
 
 Northern Pipeline
 
 simply validates orders and dispositions by the bankruptcy courts which became final in the Bankruptcy Court as of December 24, 1982.” 780 F.2d at 863 (quoting
 
 White Motor,
 
 704 F.2d at 258). We then concluded “that bankruptcy courts had subject matter jurisdiction to enter final orders in related proceedings under 28 U.S.C. § 1471 until December 24, 1982, the effective date of
 
 Northern Pipeline.” Id.
 

 Such a result is supported by the reasons given by the Court for the prospective effect of its decision in
 
 Northern Pipeline.
 
 Substantial injustice and hardship would surely be visited “upon those litigants who relied upon the Act’s vesting of jurisdiction in the bankruptcy courts....”
 
 Northern Pipeline,
 
 458 U.S. at 88, 102 S.Ct. at 2880;
 
 see also United States v. Security Industrial Bank,
 
 459 U.S. 70, 74 n. 5, 103 S.Ct. 407, 410 n. 5, 74 L.Ed.2d 235 (1982). We therefore view the Court’s prospective application and stay components of
 
 Northern Pipeline
 
 as contemplating “full rights to appellate review from all final judgments, orders, or decrees entered by the bankruptcy courts prior to the expiration of the stay.”
 
 Massachusetts v. Dartmouth Nursing Home, Inc.,
 
 726 F.2d 26, 30 (1st Cir.1984);
 
 see Boise City Farmers Cooperative,
 
 780 F.2d at 863;
 
 see also Christison v. The Norm Ross Co. (In re Eastview Estates II),
 
 713 F.2d 443, 447 (9th
 
 *1137
 
 Cir.1983);
 
 Klapp v. Landsman (In re Klapp),
 
 706 F.2d 998, 999 n. 1 (9th Cir.1983) (per curiam);
 
 Gray v. Snyder,
 
 704 F.2d 709, 711 (4th Cir.1983). The case here was fully tried and a jury verdict rendered on April 1, 1982. Final judgment was entered on September 17, 1982, well within the
 
 Northern Pipeline
 
 stay period. This was essentially the type of case the stay of the
 
 Northern Pipeline
 
 decision was designed to protect.
 

 Wilson cites the Fourth Circuit’s decision in
 
 1616 Reminc Limited Partnership v. Atchison & Keller Co.,
 
 704 F.2d 1313 (4th Cir.1983).
 
 Remic
 
 held that Rule 810 of the Rules of Bankruptcy Procedure, which directs the district court to uphold the bankruptcy judge’s factual findings unless clearly erroneous, impermissibly vested non-Article III bankruptcy judges with judicial power to decide state law claims. The court applied the
 
 Reminc
 
 decision only to the case before it and to those litigants whose cases were reviewed by a district court after December 24, 1982.
 
 Id.
 
 at 1319;
 
 see also N.S.C. Contractors,
 
 720 F.2d at 1375 n. 4-5;
 
 State Education Assistance Authority v. Johnson,
 
 43 B.R. 1016, 1018 (E.D.Va.1984). The court stated:
 

 [T]his case does not present the same issue decided in
 
 Marathon.
 
 Even though the principles invoked and applied in
 
 Marathon
 
 are the same which govern the decision here,
 
 Marathon
 
 dealt with only the powers of bankruptcy judges under the 1978 Bankruptcy Act. We are concerned with the validity of a rule promulgated under the 1898 Bankruptcy Act.
 

 Reminc,
 
 704 F.2d at 1316. The issue before us, however, is precisely the same issue before the Court in
 
 Northern Pipeline.
 
 Wilson challenges the grant of jurisdiction under § 1471(c) to bankruptcy judges. Therefore, the Court’s opinion in
 
 Northern Pipeline
 
 is controlling.
 
 See Boise City Farmers Cooperative,
 
 780 F.2d at 863.
 

 Wilson further contends that it contested the validity of jurisdiction prior to the decision in
 
 Northern Pipeline.
 
 The record supports this contention. (Tr. XXXI, 607). In light of this assertion by Wilson that jurisdiction was lacking, arguably the plaintiff’s reliance on jurisdiction would be tenuous here. However, the
 
 Northern Pipeline
 
 opinion makes no distinction between those cases where one of the litigants raised the jurisdictional issue before the decision and those cases where one raised the issue after the decision. It is true that Wilson is “not now before us claiming a windfall from any change in the law wrought by
 
 [.Northern Pipeline
 
 ],”
 
 Rem-inc,
 
 704 F.2d at 1316; nonetheless, this was not the interest the Supreme Court intended to protect with its holding that
 
 Northern Pipeline
 
 was to be applied prospectively from the expiration of the stay on December 24, 1982.
 

 II
 

 Wilson asserts the court erred in concluding that the exculpatory clause in the contract between it and the plaintiff was void as against the public policy of Oklahoma. Wilson contends that Oklahoma law is to the contrary and the exculpatory clause is enforceable. We disagree.
 

 The plaintiff originally sued Wilson in negligence and manufacturer’s products liability. (Tr. I, 4). When the plaintiff filed his motion in limine seeking,
 
 inter alia,
 
 to exclude the exculpatory provision of the contract, he relied on two independent bases. As to the negligence count, the plaintiff argued the clause was barred by
 
 Mohawk Drilling Co. v. McCullough Tool Co.,
 
 271 F.2d 627, 632 (10th Cir.1959), due to the fact that the parties did not share equal bargaining positions. As to the manufacturer’s products liability count, the plaintiff argued the clause was barred by
 
 Sterner Aero AB v. Page Airmotive, Inc.,
 
 499 F.2d 709, 713 (10th Cir.1974), due to the fact that exculpatory provisions of a contract are not permitted to shield a manufac
 
 *1138
 
 turer from a products liability claim.
 
 [8]
 
 The court agreed and granted the plaintiffs motion.
 
 [9]
 
 (Tr. II, 414-15). The case then went to trial and resulted in a hung jury. Before the second trial, the plaintiff dismissed his negligence count against Wilson and proceeded upon only the products liability theory. (Tr. XXXI, 5, 615). It is from this trial that Wilson appeals. Thus, the issue before this court is whether Oklahoma law permits a manufacturer to contract to limit its strict liability for injuries resulting from defects in its product.
 

 We have previously addressed this issue. In
 
 Sterner Aero AB v. Page Airmotive, Inc.,
 
 499 F.2d 709 (10th Cir.1974), the defendant Page Airmotive rebuilt an airplane engine and sold it to Sterner Aero AB. The engine failed on take-off, causing the plane to crash land. The plaintiff Sterner Aero AB sought damages for harm to the plane. The issue before the court was whether to give effect to a disclaimer so as to bar an action based on the manufacturer’s products liability theory. We held:
 

 It is our conclusion that the disclaimer provision was
 
 not
 
 effective to bar an action based upon Manufacturers’ Products Liability as that doctrine has been defined in
 
 Kirkland v. General Motors Corp.,
 
 [521 P.2d 1353 (Okla.1974)]. The
 
 Kirkland
 
 case involved an allegedly defective seat back adjustment mechanism in a 1969 Buick automobile. The Oklahoma Supreme Court decided that traditional concepts of contract law are inapplicable in Manufacturers’ Products Liability cases. We construe this as precluding the defendants from asserting the existence of a contractual disclaimer provision as a valid defense to liability.
 

 Id.
 
 at 713 (footnote omitted and emphasis in original).
 

 In
 
 Kirkland v. General Motors Corp.,
 
 521 P.2d 1353 (Okla.1974), the Oklahoma Supreme Court in embracing products liability stated that one of the pitfalls of reliance on a warranty theory was that historically “[Recovery was often precluded ... by the assertion of certain recognized contractual defenses such as ... the existence of a disclaimer....”
 
 Id.
 
 at 1357 (quoting
 
 Schenfeld v. Norton Co.,
 
 391 F.2d 420, 422 (10th Cir.1968)). The court further cited Restatement (Second) Torts § 402A, comment m for the proposition that the cause of action based on products liability is not affected by any disclaimer.
 
 Kirkland,
 
 521 P.2d at 1362. We thus find that the Oklahoma Supreme Court would not recognize a manufacturer’s attempt to limit its strict liability for injuries resulting from defects in its product.
 
 See Trumbower v. Sports Car Club of America, Inc.,
 
 428 F.Supp. 1113, 1118 (W.D.Okla.1976).
 

 This result is further supported by the public policy rationales for products liability articulated in
 
 Kirkland
 
 and its progeny. The court in embracing products liability stated:
 

 The burden of losses consequent upon use of defective articles is borne by those who are in a position to either control the
 
 *1139
 
 danger or make an equitable distribution of the losses when they do occur
 

 Kirkland,
 
 521 P.2d at 1361 (quoting
 
 Henningsen v. Bloomfield Motors,
 
 32 N.J. 358, 161 A.2d 69 (1969)).
 
 See Moss v. Polyco, Inc.,
 
 522 P.2d 622, 625 (Okla.1974) (citing loss spreading rationale);
 
 Coleman v. Hertz Corp.,
 
 534 P.2d 940, 944 (Okla.Ct.App.1975) (published by order of Okla.Ct.App.). Moreover, the recognized need to compensate users who are injured by a defective product marketed by a manufacturer would be furthered.
 
 See Thiry v. Armstrong World Industries,
 
 661 P.2d 515, 516 (Okla.1983).
 

 Wilson cites
 
 The Rucker Co. v. M & P Drilling Co.,
 
 653 P.2d 1239, 1242 (Okla.1982), in support of its proposition that such exculpatory clauses are enforceable. In
 
 Rucker,
 
 the Oklahoma Supreme Court did recognize the enforceability of an exculpatory clause, but the ruling concerned a negligence action, not one of manufacturer’s products liability as here. As noted, plaintiff’s case here went to trial on the retrial on
 
 only
 
 the manufacturer’s products liability claim. (Tr. XXXI, 5, 615). The public policy considerations articulated by the Oklahoma Court in the area of products liability are not the same in a negligence case.
 

 We conclude that the Oklahoma Supreme Court would not give effect to the attempt by Wilson to contract to limit its strict liability from injuries resulting from defects in the products it supplied. Such an exculpatory attempt is void as against the policy of Oklahoma. Hence the ruling of the Bankruptcy Court on this issue is affirmed.
 

 Ill
 

 Wilson finally contends that the court erred in not crediting the judgment against it by the amounts paid in settlement by PSI and Otis.
 
 [10]
 
 Specifically, the court found that Wilson’s claim was based on Okla.Stat. tit. 12, § 832(H) (1981) (Okla. Contribution Statute). The court further found that:
 

 The rule which prevails in Oklahoma to this date is that there is no contribution among joint tort feasors except in very limited circumstances.
 
 See Boyles v. Okla. Nat. Gas Co., et al.,
 
 Old., 619 P.2d 613 (1980). The statute upon which Wilson relies is in derogation of the common law rule and therefore must be strictly construed.
 
 See Adoption of Graves,
 
 Okl., 481 P.2d 136 (1971)....
 

 [[Image here]]
 

 Sub-section (H) of the statutes provides the release, covenant not to sue or similar agreement must be given to one of two or more persons liable for the same injury before it is applicable. In this case, in accordance with the supplemental pretrial order filed December 28, 1981, plaintiff sought recovery against Production Services, Inc. on the theory of breach of contract only_ [A]ny settlement based on a contract action would not come within the purview of that statute and Wilson Industries, Inc. is not entitled to any. credit for that settlement. ...
 

 [[Image here]]
 

 Under the evidence in this case, Wilson can be considered a consecutive tort fea-sor and not jointly and severally liable in tort with Otis
 

 [[Image here]]
 

 Defendant, Wilson’s application for reduction of the amount of the judgment by those amounts paid in settlement by either PSI or Otis is therefore denied.
 

 (Tr. Ill, 641-43).
 

 Wilson’s claim is based on Okla.Stat. tit. 12, § 832(H) which provides in part:
 

 H. When a release, covenant not to sue or a similar agreement is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death:
 

 I. It does not discharge any of the other tortfeasors from liability for the
 
 *1140
 
 injury or wrongful death unless its terms so provide; but it reduces the claim against others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater ...
 

 The statute upon which Wilson relies is in derogation of the common law rule on contribution as the trial court correctly noted. However, Oklahoma statutes in derogation of the common law are to be liberally construed to give full effect to the purposes of the statute.
 
 [11]
 
 Okla.Stat. tit. 25, § 29 (1981);
 
 see Terry v. Edgin,
 
 598 P.2d 228, 231 (Okla.1979). Further, the case cited by the trial court for the proposition that Oklahoma law does not recognize contribution among multiple tortfeasors except in very limited circumstances,
 
 Boyles v. Oklahoma Natural Gas Co.,
 
 619 P.2d 613 (Okla.1980), was decided before § 832(H) became effective and thus states the law before the enactment of the Oklahoma Contribution Statute.
 
 Id.
 
 at 617 n. 11.
 

 Section 832(H) is essentially a direct codification of § 4 of the Uniform Contribution Among Tortfeasors Act of 1955, 12 U.L.A. 98 (1955 revised act).
 
 See Cleere v. United Parcel Services, Inc.,
 
 669 P.2d 785, 787 (Okla.Ct.App.1983) (published by order of Okla.Ct.App.);
 
 see also
 
 Roberts,
 
 Contribution Among Joint Tortfeasor
 
 — Oklahoma
 
 Style,
 
 50 Okla.B.J. 2193, 2193 (1979). The purpose of the Uniform Act is to provide proportionate allocation of the burden among multiple tortfeasors.
 
 See Rio Grande Gas Co. v. Stahmann Farms, Inc.,
 
 80 N.M. 432, 457 P.2d 364, 366 (1969);
 
 see also
 
 12 U.L.A. 59. The Act seeks to regulate private settlement through judicial rather than private control.
 
 Roberts, supra
 
 at 2193.
 

 Essentially three conditions must be satisfied before § 832(H) may apply. First, there must be a release or covenant not to sue given to one of two or more persons.
 
 [12]
 
 Second, the multiple parties must be liable in tort. Third, they must be liable for the same injury.
 

 The trial court concluded that because the plaintiff settled with PSI in the disposition of a breach of contract action, Wilson would not be entitled to any credit for the settlement. This theory seems sound because for the statute to apply, liability must be in tort. However, turning to the allegations as framed on the Amended PreTrial Order, we find that although the contentions are labeled as contract, they actually sound in tort.
 
 [13]
 
 The plaintiff’s contentions were:
 

 The defendant, PSI, breached its contract with this plaintiff in the following manner, to-wit:
 

 1. Failing to keep a rigid cost accounting or make required reports.
 

 2. Failing to insure that there was an individual on the well site supervising
 
 *1141
 
 operations when diligence of a prudent engineer would have required it.
 

 3. Turning control of the well over to a third party who conducted operations in an imprudent manner.
 

 4. Failure to provide experts sufficiently knowledgeable in high pressure gas operations.
 

 5. Failure to perform the contract in the workmanlike manner of one skilled in working deep gas wells.
 

 (Tr. II, 384).
 

 On facts remarkably similar to these, the Oklahoma Supreme Court has held that although the transaction complained of had its origin in contract, the breach of duty complained of was in tort.
 
 Jackson v. Central Torpedo Co.,
 
 117 Okla. 245, 246 P. 426, 428 (1926). In
 
 Jackson,
 
 the plaintiffs were the owners and operators of an oil well. The plaintiffs employed the defendant to “shoot” the well so as to increase production. While attempting to shoot the well with nitroglycerin, the nitro exploded destroying the well casing. Due to the actions of the defendant, the well was totally destroyed.
 
 Id.
 
 at 427.
 

 The question before the court in
 
 Jackson
 
 was whether to apply the two year tort statute of limitation, which would bar the action, or the three year contract statute of limitation which would not. The plaintiffs argued that the action was based upon the contract of employment to shoot the well and thus should be governed by the statute of limitations for contracts.-
 
 Id.
 
 at 427. The Oklahoma Supreme Court concluded that although the contract was the origin of the relationship of the parties, the gravamen of the action was in tort and affirmed the trial court’s dismissal of the petition stating:
 

 [N]o cause of action arose by reason of a breach of the contract. The defendant was attempting to perform the contract, but performed it in an unskillful and negligent manner, and the injuries resulting were not the result of a breach of contract, but the result of negligence on the part of the defendant in the performance of the contract.
 

 Id.
 
 at 428. The plaintiffs allegations here are essentially that in attempting to perform the contract, PSI conducted itself in an unskillfull and imprudent manner. Thus, although the source of the relationship between the plaintiff and PSI was the contract, the duty itself was grounded in the principles of tort law.
 

 Other jurisdictions which have addressed analogous situations under the Uniform Contribution Among Tortfeasors Act have also looked past the bare allegations to identify the nature of the action.
 
 [14]
 
 In
 
 Loh v. Safeway Stores, Inc.,
 
 47 Md.App. 110, 422 A.2d 16 (1980), the plaintiff broke a tooth while eating a hot dog. She sued Safeway, asserting breaches of the implied warranties under the Uniform Commercial Code (U.C.C.) §§ 2-314 and 2-315.
 
 Id.
 
 at 18. Safeway filed a third party claim against Garden State Kosher Provisions (the manufacturer of the hot dog), asserting indemnity by Garden State due to the fact that the hot dog was not fit for consumption and asserting an additional negligence claim. Counsel for Garden State argued that it and Safeway could not be joint tortfeasors under the Uniform Contribution Among Tortfeasors Act because Safeway had not been sued in tort.
 
 Id.
 
 at 19 n. 2. Recognizing that a suit on implied warranty has been called “a freak hybrid born of the illicit intercourse of tort and contract,” the Maryland court concluded that under the facts of the case the suit for breach of implied warranties under the U.C.C. was one in tort for purposes of the Uniform Act.
 
 Id.
 
 at 22 (citing Prosser,
 
 The Assault Upon the Citadel (Strict Liability to the Consumer),
 
 69 Yale L.J. 1099, 1126 (I960)).
 

 In
 
 Wolfe v. Ford Motor Co.,
 
 386 Mass. 95, 434 N.E.2d 1008 (1982), the Massachusetts Supreme Judicial Court articulated the reasons for concluding that a breach of
 
 *1142
 
 an implied warranty under the U.C.C. constitutes liability in tort for purposes of the Uniform Contribution Among Tortfeasors Act. The court found that strict liability on a seller of a product is similar to the implied warranties provided by the U.C.C. The court further found an action based on implied warranties was congruent in all respects to negligence principles. Finally, the court concluded it would be contrary to general legislative purposes to freeze the law to the specific tort concepts of the year of enactment.
 
 [15]
 

 Id.
 
 at 1010;
 
 see Hayon v. Coca Cola Bottling Co. of New England,
 
 375 Mass. 644, 378 N.E.2d 442, 445 (1978). The court thus concluded “[i]n short, we find no magic in the label ‘warranty’ but rather we look to the substantive quality of the claims against [the defendant] and find them to be essentially tort claims.”
 
 Wolfe,
 
 434 N.E.2d at 1011.
 

 We believe
 
 Jackson
 
 states the law in Oklahoma. We further feel that the Oklahoma Court would find the reasoning in
 
 Loh
 
 and
 
 Wolfe
 
 persuasive. The Uniform Act does not require that multiple tort-feasors be liable under the same theories of recovery.
 
 See Cartel Capital Corp. v. Fireco of New Jersey,
 
 81 N.J. 548, 410 A.2d 674, 684 (1980);
 
 Sanchez v. City of Espanola,
 
 94 N.M. 676, 615 P.2d 993, 995 (1980).
 
 [16]
 
 Nor do we read this requirement into § 832(H). To the contrary, the construction adopted should advance rather than inhibit the purposes of the Uniform Act. We therefore conclude that the plaintiff sued PSI in tort for purposes of § 832(H). The court thus erred.
 
 [17]
 

 Although we conclude that PSI, Otis, and Wilson are liable in tort, our analysis is not complete. We must also determine whether they are liable “for the
 
 same injury.”
 
 Okla.Stat. tit. 12, § 832(H) (emphasis added). The court did not reach this issue as to PSI; however, as to Otis, the court held that Otis and Wilson were consecutive tort-feasors and not jointly and severally liable in tort. (Tr. Ill, 643).
 

 We believe the cases of
 
 Anderson v. O’Donoghue,
 
 677 P.2d 648 (Okla.1983), and
 
 Radford-Shelton and Associates Dental Laboratory, Inc. v. Saint Francis Hospital, Inc.,
 
 569 P.2d 506 (Okla.Ct.App.1976) (published by order of Okla.Ct.App.), are persuasive. In
 
 Anderson
 
 the Oklahoma Supreme Court found no error in the manner in which the trial court applied § 832(H).
 
 Anderson,
 
 677 P.2d at 653. In
 
 Anderson,
 
 the plaintiff showed negligence during surgery by two doctors. A third doctor was called to rectify the complication. His attempt failed, causing the plaintiff serious injury. The plaintiff sued the three doctors and the hospital. Prior to trial, the hospital settled its liability. The court in applying § 832(H) deducted the settlement amount from the verdict against the doctors before entering judgment.
 
 Id.
 

 In
 
 Radford-Shelton,
 
 Saint Francis hospital argued that the torts allegedly committed by it and Radford-Shelton were successive rather than joint and thus independent and consecutive acts of both defendants. Radford-Shelton, however, argued that Saint Francis hospital aggravated the plaintiffs injury.
 
 Radford-Shelton,
 
 569 P.2d at 508. The court concluded that the defendants were successive tortfeasors.
 
 [18]
 
 Nevertheless the court further concluded that
 
 *1143
 
 there existed a proper relationship for the right of contribution.
 
 [19]
 

 Id.
 
 at 511.
 

 Section 832(H) itself does not require that the parties act in concert in order to be liable as multiple tortfeasors.
 
 See Applegate v. Riggall,
 
 229 Ark. 773, 318 S.W.2d 596, 598 (1958). Section 832(H) merely requires that the multiple tort-feasors cause or contribute to the same injury sustained by the plaintiff.
 
 Id.
 

 The plaintiff cites
 
 Beesley v. United States,
 
 364 F.2d 194 (10th Cir.1966), and
 
 Campbellsville Lumber Co. v. Lawrence,
 
 268 S.W.2d 655 (Ky.1954), in support of the proposition that the statute does not apply to the relationship among PSI, Otis and Wilson. In
 
 Beesley
 
 we held that where the negligence complained of only creates a condition which “reacts with a subsequent, independent, unforeseeable, distinct agency and produces an injury, the original negligence is the remote rather than proximate cause.”
 
 Beesley,
 
 364 F.2d at 196. The actions of PSI and Otis did more than create a condition which reacted with the action taken by Wilson. The actions by PSI and Otis damaged the well to the extent that it was not producing when Wilson was called in. The actions, specifically the loss of the dyna-drill and 11,700 feet of coil tubing down the hole, required someone like Wilson to fish the coil tubing and dyna-drill out of the well. PSI and Otis were well aware of the risks inherent in a fishing operation necessitated by their own imprudent actions. There is no requirement that PSI and Otis foresee the specific harm.
 
 Radford-Shelton,
 
 569 P.2d at 510. Thus, this case is not unlike
 
 Radford-Shel-ton
 
 where the Oklahoma court concluded that the “injury caused by the initial tort-feasor is thus considered the proximate cause of the damage flowing from subsequent unskillful medical treatment.”
 
 Id.; Smith v. Missouri, K & T R.R. Co.,
 
 76 Okla. 303, 185 P. 70 (1918). Nor can the plaintiff find favor in
 
 Lawrence,
 
 268 S.W.2d at 655. There the Kentucky Court of Appeals did strictly construe their contribution statute to require concerted action on the part of joint tortfeasors.
 
 Id.
 
 at However, this narrow interpretation of the statute is not persuasive in light of the Oklahoma
 
 Anderson
 
 opinion. 656.
 

 We conclude that the court erred in not crediting the jury verdict against Wilson by the amounts paid in settlement by PSI and Otis. Our conclusion is further supported by the fact that substantially all the damages asserted against Wilson as the sole defendant were at one time asserted against all three defendants. (Tr. II, 382, 386; Tr. XXXI, 174, 196). Though part of the plaintiffs initial complaint may be construed to claim damages for injuries occurring before Wilson was called to the well, Wilson along with PSI and Otis were there when substantial damage was done.
 
 See Applegate,
 
 318 S.W.2d at 598.
 

 The jury was not made aware in a dollar amount of any settlement by either PSI or Otis. Wilson timely objected to the court’s failure to advise the jury of the settlements. (Tr. XXXI, 611). The court limited Wilson to discussing the settlements only for impeachment purposes of the plaintiff.
 
 (Id.
 
 at 17-18). Wilson was specifically ordered not to discuss any settlement amounts in the presence of the jury.
 
 (Id.
 
 at 19). Thus, the verdict rendered must be considered as the full amount of damages suffered by the plaintiff.
 
 See, e.g., Price v. Wabash R.R. Co.,
 
 30 Ill.App.2d 115, 174 N.E.2d 5, 6 (1961). Furthermore, it is the court’s duty under Oklahoma law to credit the judgment by any settlements.
 
 See Anderson,
 
 677 P.2d at 653;
 
 Cleere,
 
 669 P.2d at 788. In reaching this result there was no design to deprive the plaintiff of a
 
 single full recovery. See, e.g., Boston Edison Co. v. Tritsch,
 
 370 Mass. 260, 346 N.E.2d 901, 904 (1976). The plaintiff will still receive the full amount of the jury verdict.
 

 Accordingly, the judgment is AFFIRMED in part, REVERSED in part, and REMANDED to the bankruptcy court with directions to credit the final judgment of $208,308.02 with the amounts of settlement paid by PSI and Otis, and to re-enter such
 
 *1144
 
 judgment together with interest pursuant to 28 U.S.C. § 1961 from the September 17, 1982 entry of judgment.
 

 [1]
 

 . A dyna-drill is a specialized hydraulic drill often used for directional drilling. The dyna-drill was used here to mill up the bridges in the well. (Tr. XXXI, 36, 98-99).
 

 [2]
 

 . Specifically, the plaintiff originally sought from all three defendants the expenses incurred in connection with the reworking and fishing job which were in excess of $900,000, and the reasonable value of one-half the lease of the well which was given as consideration to a third party to complete the well. (Tr. I, 4).
 

 [3]
 

 . At this time, the plaintiff also amended his claim for damages. He sought damages for the costs of the fishing efforts (approximately $900,-000) and for the recompletion or new drilling of the well (approximately $800,000) from all three defendants. (Tr. II, 382, 386).
 

 [4]
 

 . Final judgment was adjusted to $208,308.02 and entered September 17, 1982.
 

 [5]
 

 . Even assuming that § 1293(b) was repealed by implication by the Bankruptcy Amendments and Federal Judgeship Act of 1984 ("1984 Act”), Pub.L. No. 98-353, § 104(a), 1984 U.S.Code Cong. & Ad.News (98 Stat.) 341 (codified at 28 U.S.C. § 158) and § 113 of the 1984 Act,
 
 see City Nat’l Bank of Miami
 
 v.
 
 General Coffee Corp. (In re General Coffee Corp.),
 
 758 F.2d 1406, 1409 (11th Cir.1985) (per curiam);
 
 Thistlewaite v. First Nat’l Bank of Lafayette, La. (In re Exclusive Industries Corp.),
 
 751 F.2d 806, 808 (5th Cir.1985) (per curiam), we nevertheless have appellate jurisdiction of this case because the notice of appeal was filed before July 10, 1984, the effective date of the 1984 Act and we believe the Act was not retroactive in these circumstances.
 
 See In re Quanta Resources Corp.,
 
 739 F.2d at 927.
 

 [6]
 

 .Judgment was first stayed to October 4, 1982.
 
 See, Northern Pipeline,
 
 458 U.S. at 88, 102 S.Ct. at 2880. The stay was then extended to the later date. 459 U.S. 813, 103 S.Ct. 199, 74 L.Ed.2d 160 (1982). Further extension of the stay was denied. 459 U.S. 1094, 103 S.Ct. 662, 74 L.Ed.2d 942 (1982).
 

 [7]
 

 . Those cases are:
 
 Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee,
 
 456 U.S. 694, 702 n. 9, 102 S.Ct. 2099, 2104, n. 9, 72 L.Ed.2d 492 (1982);
 
 Buckley
 
 v.
 
 Valeo,
 
 424 U.S. 1, 142, 96 S.Ct. 612, 693, 46 L.Ed.2d 659 (1976) (per curiam);
 
 Chicot County Drainage Dist. v. Baxter State Bank,
 
 308 U.S. 371, 376-77, 60 S.Ct. 317, 319-20, 84 L.Ed. 329 (1940).
 

 [8]
 

 . The exculpatory clause reads as follows:
 

 WILSON INDUSTRIES, INC. does not guarantee any rental tool, any fishing tool, or any services performed in any respect. Due to the uncertain, unknown, and integral hazards under which the service of this Company is rendered and its tools are rented, WILSON INDUSTRIES, INC. assumes no responsibility for damage of any nature to wells or equipment or for injury to employees of customers. The acceptance of our tools, supplies, and/or operator service will constitute an agreement by the customer to hold WILSON INDUSTRIES, INC. and its employees or agents harmless from liability for damage or injury arising from any cause whatsoever to wells, equipment, or employees of the customer. This condition applies equally whether our service personnel are actually operating tools, drilling rigs or equipment, or are directing operation of tools by the customer’s employees. Service of WILSON INDUSTRIES, INC. ordered at any time hereafter will be deemed and considered to be rendered under the same terms and conditions as set forth herein.
 

 (Tr. II, 270).
 

 [9]
 

 . The court found there was a disparity in bargaining power between the plaintiff and Wilson. (Tr. II, 415). Wilson does not challenge this finding. The court also found that under Oklahoma law a manufacturer may not contract to limit its strict liability for injuries resulting from defects in its product.
 
 (Id.).
 

 [10]
 

 . After the jury returned a verdict in favor of the plaintiff for $265,000, Wilson moved the court to setoff from the judgment the amounts paid in settlement by PSI and Otis which totaled $225,000. (Tr. XXXI, 670).
 

 [11]
 

 . The trial court’s reliance on
 
 In re Adoption of Graves,
 
 481 P.2d 136 (Okla.1971), is misplaced.
 
 In re Adoption of Graves,
 
 like the Supreme Court of Oklahoma’s more recent pronouncement in
 
 Davis v. Davis,
 
 708 P.2d 1102 (Okla. 1985), stands for the proposition that statutes in derogation of
 
 common law rights
 
 are to be strictly construed.
 
 See Davis,
 
 708 P.2d at 1111;
 
 In re Adoption of Graves,
 
 481 P.2d at 138. Here, we are concerned with a statute in derogation of the
 
 common law rule
 
 which is to be liberally construed.
 
 See Davis,
 
 708 P.2d at 1111.
 

 [12]
 

 . There is no requirement that the parties be joint tortfeasors in the strict sense of the word. In fact the term "joint tortfeasor” was deleted from the 1939 Act. 12 U.L.A. 64 (Commission’s comment).
 

 [13]
 

 .In the context of determining federal question jurisdiction, we are cognizant of the dictates of the Supreme Court's opinion in
 
 Pan American Petroleum Corp. v. Superior Court of Delaware,
 
 366 U.S. 656, 81 S.Ct. 1303, 6 L.Ed.2d 584 (1961), that "the party who brings a suit is master to decide what law he will rely upon.”
 
 Id.
 
 at 662, 81 S.Ct. at 1307 (quoting
 
 The Fair
 
 v.
 
 Kohler Die & Speciality Co.,
 
 228 U.S. 22, 25, 33 S.Ct. 410, 411, 51 L.Ed. 716 (1913)). Nevertheless, Oklahoma’s substantive law commands us to pierce the allegations and to discern the gravamen of the action.
 
 See Erie Railroad Co.
 
 v.
 
 Tompkins,
 
 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938);
 
 see also Johnson v. Colt Indus. Operating Corp.,
 
 797 F.2d 1530, 1536 (10th Cir.1986) (federal court is bound in diversity case by the state's substantive law).
 

 [14]
 

 . A sister state’s interpretation of a uniform law is considered persuasive in Oklahoma.
 
 See Cleere,
 
 669 P.2d at 788. The Act itself provides for uniformity in its interpretation. 12 U.L.A. 63.
 

 [15]
 

 . We find it worth noting that the outcome in
 
 Wolfe
 
 was reached in a jurisdiction which strictly construes statutes in derogation of the common law.
 
 See Hayon,
 
 378 N.E.2d at 445.
 

 [16]
 

 .
 
 Sanchez
 
 illustrates the pitfalls of attempting to strictly construe the Uniform Act. One judge in
 
 Sanchez
 
 would have read "liable in tort” to mean liability founded on negligence only.
 
 Sanchez,
 
 615 P.2d at 998 (Sutin, J. dissenting).
 

 [17]
 

 . The plaintiff does not contend that Otis was not sued in tort. The Amended Pre-trial Order explicitly states that Otis was sued in negligence and manufacturer’s products liability. (Tr. II, 384-85). The court thus correctly concluded that Otis was sued in tort. (Tr. Ill, 643).
 

 [18]
 

 .The
 
 Radford-Shelton
 
 court defined successive tortfeasors as "those whose independent, negligent acts although severable in point of time, caused injury to the same third party.”
 
 Id.
 
 at 509.
 

 [19]
 

 . This result was reached before the enactment of Okla.Stat. tit. 12, § 832(H).